IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


IKON OFFICE SOLUTIONS, INC.,

       Plaintiff,

                                CIVIL ACTION NO.

v.                             1:12-cv-1316-JEC

THE LAW OFFICE OF CRAIG KUGLAR,
LLC,

       Defendant.


**ORDER & OPINION**

This case is presently before the Court on defendant's Motion to Dismiss Plaintiff's Amended Complaint [19] and Defendant's Alternative Motion to Stay [25]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion to Dismiss [19] should be **DENIED** and defendant's Motion to Stay [25] should be **DENIED.**[1]

**BACKGROUND**

The present litigation is an offshoot of the criminal trial of Lee Farkas, who in April of 2011 was tried and convicted in the

---

[1] The docket also shows, as pending, another motion to dismiss [9], which was filed in the Eastern District of Virginia, where this case was originally filed. As that motion largely dealt with defendant's arguments in favor of a transfer to this district, which occurred, this motion is **DENIED as moot.**

Eastern District of Virginia for bank fraud in the matter of *U.S. v. Farkas*, Case No. 1:10-CR-200-LMB (E.D. Va. Apr. 19, 2011). This case is the second of two lawsuits about who must pay Farkas's legal bills.

The current defendant is the Law Office of Craig Kuglar, LLC ("Kuglar"), Farkas's lawyer in his criminal trial. Farkas, a former executive of Taylor, Bean and Whitaker Mortgage Company ("TBW"), was the beneficiary of an insurance contract with the National Union Fire Insurance Company ("National Union"), under which National Union agreed to pay for legal expenses associated with Farkas's employment at TBW. In December 2010, several months before Farkas's trial was to begin, Farkas attained a $1 million advance from National Union for the defense costs in his criminal trial. (Def.'s Mot. to Dismiss Am. Compl. [19] at 3.)

A month after this advance, in connection with Kuglar's defense of Farkas, Kuglar engaged the services of the plaintiff in the current lawsuit: Ikon Office Solutions, Inc. ("Ikon"). Ikon's business is to provide "litigation support, including electronic discovery and document production services, to law firms and in-house legal department customers." (Am. Compl. [13] at ¶ 7.) The agreement between Kuglar and Ikon is attached to plaintiff's amended complaint and is titled "Statement of Work For The Law Office of Craig Kuglar, LLC." (hereinafter, "Agreement" or "Statement of Work")

2

(Am. Compl. [13-1].)   It was signed in Georgia.   (Def.'s Mot. to Dismiss Am. Compl. [19] at 3.)   The title page refers to "Matter: Farkas," and it specifies that it was "Submitted to: Craig Kuglar." (Am. Compl. [13-1] at 1.)   The "Project Summary" states that "IKON will provide the services listed herein to The Law Office of Craig Kuglar."   (*Id.* at 3.)   Kuglar is listed as the one to release documents to Ikon, and Kuglar is the one to receive deliverables from Ikon.   (*Id.* at 6.)   Fines for late payments were to be assessed to Kuglar.   (*Id.* at 9.)

The Agreement also lists several terms and conditions to which Ikon and the "client" agreed concerning services to be rendered, including confidentiality and other matters.   (*Id.* at 10-13.)[2]   The "client" is defined as the entity referred to on the cover page of the Statement of Work, which, as noted above, includes Kuglar.   (*Id.* at 10.)

In the signature block, Kuglar's signature is on the line titled "Client," and Kuglar's "Title" is described as "Owner, Atty for Lee Farkas."   (Am. Compl. [13-1] at 13.)

Kuglar entered into the Agreement with Ikon on January 24, 2011.

---

[2]   The Agreement contains a merger clause stating that the Statement of Work "make[s] up the entire agreement between them regarding the Services and supersede all prior written or oral communications, understandings or agreements between the parties....."   (Am. Compl. [13-1] at 13.)

3

(*Id.*)  Farkas's trial commenced on April 4, 2011, and a jury found him guilty on April 19, 2011.  (Def.'s Mot. to Dismiss Am. Compl. [19] at 4.)  On April 28, 2011, National Union notified Farkas that it would no longer advance any defense costs to him, and that it might even seek the $1 million it had already paid.  (Def.'s Mot. to Dismiss Am. Compl. [19] at 4.)[3]  At that time Farkas had incurred approximately $2 million in expenses, including the amount owed to Ikon, which was allegedly $500,000.

Soon after National Union refused to pay the costs of Farkas's defense, Farkas brought a declaratory judgment action in the Eastern District of Virginia, seeking a ruling that National Union owed him the full cost of his legal defense.  On March 21, 2012 the district court held that not only did National Union not have to pay the outstanding costs of Farkas's defense, but that Farkas owed National Union the $1 million already advanced.  *Farkas v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 1:11-cv-529-LMB-IDD (E.D. Va.), at Dkt. Nos. 73-75; Def.'s Mot. to Dismiss Am. Compl. [19] at 5.  Farkas appealed the district court's ruling to the United States Court of Appeals for the Fourth Circuit, which recently affirmed the district court's decision.  *Farkas v. Nat'l Union Fire Ins. Co. of Pittsburgh,*

---

[3]  National Union argues that under the insurance agreement, it was not responsible for defense costs if Farkas was guilty of a crime.  *Farkas v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 1:11-cv-529-LMB-IDD (E.D. Va.), at Dkt. No. 73.

4

*Pa.*, No. 12-1481 (4th Cir. April 11, 2013).  On December 30, 2011, Ikon, which was still owed $500,000 for services it had rendered in the course of Farkas's trial, brought an action against Kuglar in the Eastern District of Virginia for breach of contract and fraudulent inducement.  The parties thereafter agreed to move the action to its current resting point, the Northern District of Georgia.

Ikon claims Kuglar owes it money under the Statement of Work. Kuglar agrees that it has not paid Ikon, but contends that the funds were to come from Farkas or Farkas' insurance company--not from Kuglar.  Kuglar argues that his firm was acting as an agent for the principal, Farkas, and is therefore not liable to Ikon.  Ikon counters that its Agreement was with Kuglar--not with Farkas--and Kuglar is therefore liable for amounts owed under the Agreement.

Ikon also includes two tort claims in its amended complaint--one for common law negligence and one for negligent misrepresentation. It has withdrawn its earlier fraud claim.  The basis for the two tort claims is that Kuglar allegedly assured Ikon throughout the pre-trial and trial period that Farkas's insurer would pay the full costs of Farkas's defense.  According to Ikon, Kuglar knew or should have known that National Union would not pay more than $1,000,000, and had Kuglar informed Ikon of this, Ikon would not have continued to perform services for Kuglar.

5

Kuglar also filed a motion seeking to stay the current action in anticipation of the Fourth Circuit deciding the appeal in *Farkas v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* That appeal having now been resolved in favor of National Union, the motion to stay is moot.

**DISCUSSION**

**I.**    **MOTION TO DISMISS**

     A.    <u>Standard</u>

To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "the pleading standard . . . does not require 'detailed factual allegations,'. . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, simply stating a legal conclusion does not constitute an adequate factual allegation. *Id.; see also Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007).

     B.    <u>Contract Claim</u>

The fundamental issue in the contract claim is whether Kuglar contracted with Ikon merely as an agent for Farkas without assuming personal liability, or whether he contracted as a co-principal, assuming personal liability for the contract.

Kuglar argues that when signing the Agreement with Ikon, he was

6

"acting as an agent for a disclosed principal," and was thus not a party to the Statement of Work and should not have to pay Ikon. (Def.'s Mot. to Dismiss Am. Compl. [19] at 8 (citing *Myers v. GAF Corp.*, No. 3184 MAR.TERM. 1994, 2000 NOV.TERM. 1994, 3262 DEC.TERM. 1994, 705 MAY.TERM. 1995, 3178 DEC.TERM. 1997, 2000 WL 33711079 (Pa. Com. Pl. Dec. 12, 2000)(O'Keefe, J.)).)[4]  To support this argument, Kuglar points to the Agreement's signature page, which describes Kuglar as attorney for Farkas.  Kuglar also cites the cover page, which describes the "Matter" as "Farkas."

Further, "it makes no sense," Kuglar contends, for Kuglar to have retained the services of Ikon, apart from his representation of Farkas.  (Def.'s Mot. to Dismiss Am. Compl. [19] at 9.)  It is certainly true that Kuglar stood to benefit from the contract in no way other than in his capacity as Farkas' lawyer.  Finally, Kuglar cites an affidavit by Ikon employee John White, who attests that Ikon expected Farkas's insurer, not Kuglar, to be writing the check that covered its services.  (Def.'s Reply in Further Supp. of its Alt. to Mot. to Stay [*sic*] [28-1] at Ex. A, Aff. of John J. White at ¶ 15 ("Kuglar signed the Contract as 'Attorney for Lee Farkas,' which was consistent with my understanding that Kuglar Law was acting as agent

_____

[4]  Pennsylvania law applies to plaintiff's contract claim.  (Am. Compl. [13-1] at 12 (Statement of Work reads that "any Services procured hereunder shall be governed by the laws of the Commonwealth of Pennsylvania both as to interpretation and performance.").)

for Lee Farkas and would not be responsible for payment of the expenses.").)  These facts support a finding that Kugler and Ikon employee White  understood Kuglar to be acting merely within the scope of his authority as Farkas' agent.

On the other hand, per the terms of the Agreement, Kuglar is identified as Ikon's client, not Farkas.  (Am. Compl. [13-1] at 10 ("client" defined as the entity referenced on the Agreement's cover page); *id.* at 1 (cover page, listing Kuglar's name).)  Kuglar signed the Agreement and agreed to the terms of the contract.  (*Id.* at 13 ("The Law Office of Craig Kugler, LLC hereby authorizes IKON to proceed with the litigation support services described and specified in the foregoing Statement of Work for IKON Services, and agrees to the terms and conditions as specified herein.").)  Most importantly, nowhere does Kuglar explicitly disavow liability or state that he is only acting as Farkas' agent.  These facts strongly support a finding that Kuglar was a co-principal on the contract.

Arguably then, the contract is somewhat ambiguous.  This is aggravated by the fact that the law is less than clear on the presumptions applicable in situations such as this, where an attorney contracts for litigation support services.  While the parties cite no authority addressing the issue of an attorney's personal liability in the context of contracting with litigation support providers for her client, the Court has researched the issue and discovered a division

8

in the jurisprudence.

Kuglar is correct that attorneys are typically viewed as agents of their clients. In Pennsylvania, an agency relationship is established with "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." *Scott v. Purcell*, 490 Pa. 109, 117 (1980) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)). In Pennsylvania, as in other states, an attorney-client relationship is "generally regarded as an agency relationship," *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 857 (3d Cir. 1996), and thus, a client, and not the attorney, will be responsible for contracts entered into by the attorney on behalf of a client.

This makes much sense in activities such as commercial transactions, where an attorney may purchase a tract of land or a building on behalf of the client. *See Sharon Gen. Hosp. v. McLaughlin*, 3 Pa. D. & C. 4th 582, 591 (Pa. Com. Pl. 1989)("[w]hen acting between their clients and plaintiff, as a third party, defendants were attorneys, and, therefore, the agents of their clients.").

Matters are more complicated when it comes to litigation expenses, however, with courts divided on the issue:

9

> There is some authority that an attorney ordering goods or services in connection with litigation is ordinarily to be treated as a principal, so that, even when the lawyer is known to be an attorney acting for a particular client, she will be personally liable for expenses incurred in the litigation absent an express disclaimer of responsibility. However, a number of courts have held that an attorney is not personally liable for expenses incurred in connection with litigation unless he expressly or impliedly assumes special liability for them.

12 Williston on Contracts § 35:62 (4th ed.)(footnotes omitted). Obviously then, the outcome of this case will be determined by which of the above two standards is used.

Those courts that have adopted the first standard have pointed out that treating lawyers as regular agents makes less sense in the context of litigation than it does in other contexts.[5] Lawyers are typically the primary decision-makers in the litigation context and so are thought to be acting with more independence (and thus personal responsibility) than does a typical agent. *See Judd & Detweiler,*

---

[5] Several courts have held that attorneys are responsible for contracts entered into by the attorneys on behalf of their clients in the course of litigation. *See, e.g., Judd & Detweiler, Inc. v. Gittings*, 43 App. D.C. 304, 310-11 (D.C. Cir. 1915); *McCullough v. Johnson*, 307 Ark. 9, 12 (Ark. 1991); *Burt v. Gahan*, 351 Mass. 340 (1966); *Ingram v. Lupo*, 726 S.W. 2d 791 (Mo. App. 1987); *Molezzo Reporters v. Patt*, 94 Nev. 540 (1978); *Roberts, Walsh & Co. v. Trugman*, 109 N.J. Super. 594 (1970); *Gualtieri v. Burleson*, 84 N.C. App. 650 (1987); *Gaines Reporting Serv. v. Mack*, 447 N.E. 2d 1317 (Ohio App. 1982); *C.C. Plumb Mixes, Inc. v. Stone*, 108 R.I. 75 (1971); *Copp v. Breskin*, 782 P.2d 1104, 1107 (Wash. App. 1989). For a collection of cases, *see* Jay Zitter, Attorney's Personal Liability for Expenses Incurred in Relation to Services for Client, 66 A.L.R. 4th 256 (1988)(listing cases through 2008).

10

*Inc.*, 43 App. D.C. at 310-11 ("The attorney usually determines what steps are to be taken in his client's interest, and the acts of the attorney in the conduct of litigation are binding upon the client. We therefore deem the just and equitable rule of law thus established to be that, in the absence of express notice to the contrary, court officials and persons connected, either directly or indirectly, with the progress of the litigation, may safely regard themselves as dealing with the attorney, instead of with the client."); *Burt v. Gahan*, 351 Mass. at 342 ("While in a broad sense counsel may be an agent and his client a principal, there is much more involved than more [sic] agency.  The relationship of attorney and client is paramount, and is subject to established professional standards.  In short, the attorney, and not his client, is in charge of litigation, and is so recognized by the court."); *Wisconsin Title Serv.*, *Inc. v. Kirkland & Ellis*, 168 Wis. 2d 218, 224 (1992)("Litigators, not their clients, create and frame the issues for trial.  The litigator is therefore not a mere subordinate, important only as a representative of the principal.  Rather, the litigator is the person primarily responsible for how the litigation is going to be conducted.").

Additionally, in a criminal trial such as Farkas's, where the client faces significant potential fines from the government and there is doubt whether his expenses will be covered by insurance, third-party vendors may be willing to work on such a case only if

11

there is someone other than the client from whom they can seek payment.[6] In such cases, the lawyer is often better positioned to gauge the client's resources, and thus to determine whether the client can ultimately afford the expenses. Due to that informational advantage, extending the burden of liability to the lawyer makes sense.

Courts taking this view also note that the reputation of the legal profession suffers when attorneys enter contracts and do not pay for services provided, instead telling the third party to look to the (perhaps imprisoned) client for payment. *See generally Copp*, 56 Wash. App. at 235 ("Putting the burden on the attorney promotes public trust and confidence in the legal profession...."). It diminishes the prestige of the profession and makes it more difficult for future attorneys to enter contracts in furtherance of litigation.

Thus, for these reasons, "the modern approach is to hold the lawyer liable to expert witnesses, court reporters, and other litigation-support providers unless the lawyer makes it clear at the time the provider is retained that the provider must look only to the

_____

[6] Kuglar speaks of the "intent of the parties," (Def.'s Mot. to Dismiss Am. Compl. [19] at n.28), arguing that both parties "inten[ded]" that National Union would pay Farkas' legal bills; however, what Kuglar means by "intent" is ambiguous. The Court agrees that both sides may have expected or at least hoped that National Union would pay both Kuglar and Ikon in full. This shared expectation does not mean that it was both sides' understanding that the contract was not binding on Kuglar.

client."   Joseph M. Perillo, *The Law of Lawyers' Contracts Is Different*, 67 Fordham L. Rev. 443, 472 (1998).

This, however, does not end the inquiry.  As noted above, this contract is governed by Pennsylvania law, and Pennsylvania law has not explicitly accepted the so-called "modern approach."  The case law, such as it is, even suggests that Pennsylvania courts adhere to the alternative position that "an attorney is not personally liable for expenses incurred in connection with litigation unless he expressly or impliedly assumes special liability for them." Williston on Contracts § 35:62 (4th Ed.).  The Court has not found any recent Pennsylvania cases directly on point, and the parties have cited none.  The Court will discuss the Pennsylvania law which it did find on the subject.

There are four Pennsylvania cases[7]--*Moore*, *Pessano*, *Walkinshaw*, and *Huntzinger*--that address the issue indirectly, and as Judge Stapleton of the Third Circuit has stated, these cases suggest that

---

[7]  *Moore v. Porter*, 13 Serg. & Rawle 100 (Pa. 1825); *Pessano v. Eyre*, 13 Pa. Super. 157 (1900); *Messenger Publ'g Co. v. Walkinshaw*, 102 Pa. Super. 445 (1931); *Huntzinger v. Devlin*, 80 Pa. Super. 187 (1922).  Judge Stapleton also cited a string of more recent cases from other jurisdictions which he said followed this rule. *McCarthy*, 80 F.3d at 859.  These cases are less numerous than those which have found attorneys liable, and the alleged holding of *Christensen, O'Connor, Garrison & Havelka v. State of Washington, Dep't of Revenue*, 97 Wash. 2d 764 (1982), cited by Judge Stapleton in *McCarthy*, has received criticism from a subsequent Washington appellate court. *See Copp*, 56 Wash. App. at 231 (arguing that "[t]he *Christensen* dictum" was no longer controlling on this issue).

13

Pennsylvania may actually hold a view contrary to the contemporary trend discussed above. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 859 (3d Cir. 1996)(Stapleton, J., concurring in part and dissenting in part)("Based on *Moore*, *Pessano*, *Walkinshaw*, and *Huntzinger*, I conclude that in Pennsylvania, 'when an attorney contracts with a third party for the benefit of a client for goods or services to be used in connection with the attorney's representation of a particular client and the third party is aware of these facts, the attorney is not liable on the contract unless he either expressly or impliedly assumes some type of special liability.'")(quoting *Eppler, Guerin & Turner, Inc. v. Kasmir*, 685 S.W. 2d 737, 738 (Tex. Ct. App. 1985)). Under Judge Stapleton's reading, Pennsylvania law presumes that the attorney is not personally liable on contracts he forms as an agent for his client unless he indicates acceptance of that responsibility.

The Court has reviewed *Moore*, *Pessano*, *Walkinshaw*, and *Huntzinger*. Because the Pennsylvania law seems to rest on these few cases, they deserve special scrutiny. *Moore* is an 1825 case in which the Pennsylvania Supreme Court held that a prothonotary,[8] or chief

---

[8] When he was introduced to an Allegheny County politician and prothonotary, President Harry Truman is rumored to have asked, "What the hell is a prothonotary?" Pittsburgh Business Times: "*Row Office Holders Not Political Bumpkins,*" (Mar. 17, 2003), available at http://www.bizjournals.com/pittsburgh/stories/2003/03/17/editorial4 .html?page=all (last visited Jan. 15, 2013).

clerk of court, could not seek recourse against an attorney for non-payment of fees by the attorney's client. *Moore v. Porter*, 13 Serg. & Rawle 100 (Pa. 1825). Rather, the prothonotary had to seek payment from the client directly. As the court noted in *Moore*, this may have put prothonotaries in a precarious position, as plaintiffs and defendants are often impecunious and the prothonotaries may not have sufficient means to extract payment. This problem was sometimes dealt with by a statute protecting prothonotaries, but at least in 1825, Pennsylvania did not have such a statute. *Id.* at 102 ("It is believed, that scarcely any where are prothonotaries so unprotected as in Pennsylvania."). Despite the potential unfairness, the court was clear that the burden of collecting the debt from the client fell not on the lawyer, but on the prothonotary. *Id.* at 101. Further, an attorney would only become liable in such a situation if she made some representation, over and above contracting for her client, that the prothonotary would have recourse to her. *Id.* ("The fees are not chargeable to the attorney of the party for whom the services are done, unless he has become security for the costs.")

The *Huntzinger* case from 1922 found that an attorney was not liable to a printer for the printing costs of an appellate brief. *Huntzinger v. Devlin*, 80 Pa. Super. 187 (1922). As in *Moore*, this dispute involved routine court expenses, as "the printing of the paper-books [was] required by the rules of the appellate court."

15

*Huntzinger*, 80 Pa. Super. at 190.   The court, however, went on to make clear that the kinds of contracts to which this rule applied were not limited to those entered into as a matter of course at trial:

> Under an ordinary contract of employment an attorney has implied authority to incur reasonable expenses in conducting his client's case, although not expressly authorized to charge his client with the amount thereof. Such expenses cover the fees of referees, stenographers and expert witnesses; the services of a bookkeeper in examining partnership books; the printing of briefs, although not required by a rule of court; and similar disbursements.

*Id.* at 189.   The court thus included in the list of activities falling under the ordinary scope of a lawyer's agency non-essential contracting, such as hiring expert witnesses and procuring the services of persons (such as bookkeepers) with specialized knowledge pertinent to the representation.

In a subsequent case also involving printing materials for litigation, the court cited *Huntzinger* for the point that a contractual liability incurred in the regular course of litigation did not presumptively bind the attorney personally. *Messenger Publ'g Co. v. Walkinshaw*, 102 Pa. Super. 445, 447 (1931).   As there was a dispute as to what exactly the lawyer had told the printer in negotiating the contract, the court held that the matter required submission to a jury.   *Id.* ("If...the contract was made personally by the attorney, and he pledged his credit for payment of the bill, he

16

would be bound, but if...the contract was made by him as attorney for his client, the client would be bound.").

Finally, the *Pessano* court found no general contractual liability of lawyers for the expert witnesses they hire for their clients, but only that "[a]n attorney at law *may make himself liable by a special promise* for the compensation of an expert witness called to testify for the client." *Pessano v. Eyre*, 13 Pa. Super. 157, 163 (1900)(emphasis added). The court there made perhaps the strongest statement of the principle that, absent representations by the lawyer that she would be personally liable on the contract, only the client is a principal. Whether the attorney made such a "special promise" is a jury question. *Id.*

There thus seems to be some basis for Judge Stapleton's view that Pennsylvania law places a lawyer's contracting for litigation support services within the ordinary agency rules.[9] If that is the

---

[9] Some further support for Judge Stapleton's view comes from 1 Standard Pennsylvania Practice 2d § 4:125:

> The principle of agency that a contract executed by an agent acting within the scope of his or her authority, on behalf of his or her principal, imposes no personal liability upon the agent unless credit is given expressly and exclusively to the agent, who intends to assume personal liability, is generally applicable to contracts executed by attorneys on behalf of their clients. However, were the attorney is not merely acting as a client's agent, the attorney may then be liable to the third party.

(citing *Walkinshaw* and *Huntzinger*).

case, the evidence must show a "special promise" on the part of Kuglar to be liable on the contract in order for Ikon to recover. If, alternatively, Pennsylvania follows the "modern approach," the burden falls upon Kuglar to show that he effectively disavowed his liability as co-principal for litigation services expenses incurred in representing Farkas. As it is uncertain how Pennsylvania law would decide this question--and the parties' briefing on this is sparse--then it is possible that Kuglar may be responsible to Ikon for services rendered under the Statement of Work. Dismissal of Ikon's contract claim is therefore premature.

Because there are matters of both fact and law to be determined, Ikon's contract claim may proceed. Further, in ay summary judgment pleadings, the parties are instructed to better brief Pennsylvania agency law as it relates to lawyers contracting for litigation services and to the contract at issue here. Finally, in any summary judgment pleading, the parties shall set out the procedure available, if any, for this Court to certify the above legal question to the Pennsylvania Supreme Court. The Court will do so, however, only when there is a complete factual record.

C.   <u>Tort Claims</u>

Plaintiff Ikon has also pled two tort claims, described as negligence and negligent misrepresentation in Ikon's Amended

18

Complaint.[10]

In Georgia,[11] one who supplies information in the course of a transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who reasonably rely upon that information, and of whose reliance the supplier of information

---

[10] In its amended complaint, plaintiff styled its claims as one for negligence and one for negligent misrepresentation. Both of these claims boil down to Ikon's claim that Kuglar should have told Ikon that National Union was not going to pay for Farkas's defense, and so the Court will discuss them together.

[11] The parties disagree about the law to be applied to plaintiff's tort claims. The defendant argues that the choice of law clause in the contract selects Pennsylvania law as to "performance" of the contract, and so because the negligence claims relate to conduct relating to the contract, Pennsylvania law is appropriate. Ikon contends that the choice of law clause applies only to the contract, not tort claims independent of the contract, and so the law of the place of injury ought to apply--that being Georgia.

The Court has considered the issue. Pennsylvania appears to permit professional negligence actions only if an attorney-client relationship is present, whereas Georgia does not impose this requirement. As Georgia law seems to be the more permissive of the two jurisdictions, in the interests of fairness to the plaintiff, the Court will apply this law at the dismissal stage. It is also likely that a choice of law analysis points to the application of Georgia law since Ikon's Atlanta office was the one doing most of the work for Kuglar, and thus, Georgia was the "site of the injury" under traditional choice of law analysis. *IBM Corp. v. Kemp*, 244 Ga. App. 638, 641 (2000)("[T]he last event necessary to make an actor liable for fraud is the injury, and consequently, for purposes of *lex loci delictis*, the place of the wrong is where that injury is sustained.")(internal quotations omitted); Def.'s Mem. of Law in Supp. of Mot. to Dismiss and Mot. to Transfer [11] at 2 ("IKON's Atlanta office not only handled the delivery and execution of the contract, it was responsible for performance of the work under the SOW and the billings for that work.").)

19

was aware.  *Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 250 Ga. 680, 681 (1983)(engineer allegedly was negligent in preparing report which he knew third parties would rely on); Restatement (Second) of Torts § 552 (1977)("One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.")(adopted in *Robert & Co.*).

Defendant's alleged negligence here consists of Kuglar's reassurance to Ikon that National Union would pay for Farkas's defense.  Ikon does not reference any specific statements by Kuglar to this effect, but it does allege that Kuglar expressed certain "conclusions and opinions regarding the availability and commitment of sufficient funds to pay for the cost of Mr. Farkas' defense" to Ikon.  (Am. Compl. [13] at ¶ 32.)

It is uncertain whether Ikon will be able ultimately to prevail on its negligence claim.  First, according to Ikon, Ikon and Kuglar had a contract by which Ikon would perform services for Kuglar, and Kuglar would compensate Ikon.  If it is ultimately determined that Kuglar was bound on the contract, any assurances he made about the

20

likelihood that the insurer would cover the bills would seem to be beside the point.  That is, should Kugler not pay, then the remedy is to sue him per the terms of the contract.

Of course, the same merger clause that plaintiff relies on in its contract claim--precluding reliance on statements not within the text of the Agreement--will seemingly undermine plaintiff's argument, in its tort claims, that it relied on representations from Kuglar that National Union would pay Farkas's legal bills.

If, on the other hand, Pennsylvania law will require a conclusion that the party to the contract was the client, Farkas, and that Kuglar was merely an agent acting on behalf of Farkas, any false representations made by Kuglar--whether negligent or intentional--become more significant and potentially provide an alternate avenue for relief by plaintiff.

Nevertheless, given the present uncertainty as to the viability of the contract claim, as well as the uncertainty of what facts will be developed in discovery, the Court **DENIES** defendant's motion to dismiss the tort claims.

## II.  MOTION TO STAY

Kuglar also filed a motion to stay, citing parallel litigation in the Fourth Circuit, in which Farkas had appealed a district court ruling which found National Union did not have to pay Farkas's legal expenses.  Had Farkas prevailed in that litigation, the present

21

litigation might have been resolved.  As that parallel litigation has now been resolved and has not mooted the claims in this case, there is no need for a stay.  This Court therefore **DENIES** Kuglar's motion to stay.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court **DENIES without prejudice** defendant's Motion to Dismiss [19] and **DENIES** defendant's Motion to Stay [25].  Defendant's Motion to Dismiss [9] filed in the Eastern District of Virginia is **DENIED as moot**.

SO ORDERED, this 23rd day of September, 2013.


<u>/s/ Julie E. Carnes</u>
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)